**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

In re: Chapter 11

KEVIN R. ADELL, Case No.: 2:26-bk-02722-FMR

Debtor.
_______________________/

# BISHOP GEORGE BLOOMER'S EMERGENCY MOTION FOR RELIEF FROM STAY REGARDING MICHIGAN DISTRICT ACTION

Pursuant to Federal Rule of Bankruptcy Procedure 4001, Bankruptcy Code §362(d), L.B.R. 4001-1(c)(1), and other applicable law, Bishop George Bloomer ("Bishop Bloomer"), a creditor and party in interest in the above-captioned chapter 11 bankruptcy case (this "Reorganization"), hereby moves on the following grounds for an order of this Court terminating or modifying the automatic stay for cause to allow Bishop Bloomer and Kevin R. Adell (the "Debtor") to proceed with an action more fully described below (the "Michigan District Action"), previously initiated by Bishop Bloomer against the Debtor and others:

## A. Background Allegations Relating to the Parties and Their Activities

1. Bishop Bloomer is an African American evangelist, pastor, renowned speaker, author, and entrepreneur. He is the pastor and founder of Bethel Family Worship Center, a multi-cultural ministry in Durham, North Carolina. Through Bishop Bloomer's personal and religious activities, he demonstrates an African American racial identity and Christian religious message.

2. The Debtor is an entrepreneur whose business activity includes his

ownership and operation of Adell Broadcasting Corporation, based in the vicinity of Detroit, Michigan. The Debtor owns and controls The Word Network Operating Company, Inc. ("TWN"), also known as The Word, a religious broadcasting network that claims to be the largest African-American religious network in the world. The Debtor also owns Church of the Word d/b/a The Word Network Church, ("WNC"). TWN and WNC (together, the "Corporate Defendants") are respectively Delaware and Michigan business entities based in Detroit.

3. The Debtor is heavily based in Metro Detroit broadcasting operations, including WFDF, and WADL, which are respectively a radio and a television station, both based in Detroit, Michigan. The former is based in Farmington Hills, Michigan, and is referred to as "910 AM Superstation[1]." The later is identified as Channel 38, based in Mount Clemens, Michigan. Both are conservative Christian-oriented broadcasters.

4. The Debtor is believed to have vast holdings outside of the broadcasting industry. For example, the Debtor's non-core assets include:

a. An automobile collection with more than 100 vehicles, including (i) a 1949 Buick Roadmaster valued at $900,000 according to the Debtor's interview on Pawn Stars Do America, Season 2, (ii) the original "General Lee" Dodge Charger from "The Dukes of Hazzard" tv show, (iii) the late Burt Reynolds' Trans-Am from "Smokey and The Bandit," (iv) the faux Ferrari 250 GT California Spider from "Ferris Bueller's Day Off," (v) a custom made Lamborghini Tractor, and (vi) 2019 Lamborghini Aventador valued at $1,303,492, to name a few;

b. A 310-acre estate in Metamora, Michigan;

---

1 In an article published on September 13, 2025, the Michigan Association of Broadcasters quoted the Debtor as intending to retire in connection with news that he was selling a 22-acre parcel of land associated with WADL for a price that was not published, as well as WADL itself for $75,000,000.

c. A mansion having a "Zillow" value of $8,950,000 at 5035 Brookdale Road, Bloomfield Hills, Michigan 48304;

d. A mansion having a "Zillow" value of $3,927,300 at 459 Martell Drive, Bloomfield Hills, Michigan 48304; and

e. A mansion having a "Zillow" value of $8,075,400 at 636 14th Ave. South, Naples, Florida 34102.

However, it presently appears that most of the Debtor's net worth involves his flagship broadcasting conglomerate.

5. The Debtor is financially sophisticated and familiar with bankruptcy principles, having previously filed a voluntary petition for reorganization in this Court, commencing an extremely contentious bankruptcy case that was ultimately dismissed[2].

6. TWN has recently been criticized for its lack of transparency by a watchdog organization that monitors religious organizations[3] for failure to provide financial information about its business. Financial secrecy of the Debtor and the Corporate Defendants has also led to years of auditing activity and litigation initiated by the Internal Revenue Service.[4]

---

2 Bankruptcy Petition #: 2:03-bk-23684-ALP

3 MinistryWatch's mission on its website is noted as follows:

> MinistryWatch is an advocate for **TRANSPARENCY**, **ACCOUNTABILITY**, and the renewed **CREDIBILITY** of Christian ministries.

Because TWN is not a member of the evangelical counsel for financial accountability and does not provide access to audited financial statements, it is an outlier in religious broadcasting ministries. The "MinistryWatch Donor Confidence Score" as of July of 2026 was 0, out of a possible score of 100, and an advisory to "withhold giving."

4 See e.g. United States of America v. Adell et al., Case No. 2:23-CV-10957, and note that the Debtor has scheduled the IRS as the holder of Claims 14 through 17, in the respective amounts of $12,076,145, $1,513,210, $1,170,958, and $22,000,000 for a total of $36,760,313, partly disputed by the Debtor.

7. The Debtor was sued for racketeering and fraud by a family member on behalf of several trusts relating to family members, but on July 14, 2026, the presiding Judge dismissed the action based upon statute of limitations considerations, with the opening sentence of the Court's opinion stating the following[5]:

> Despite the shady history underlying Defendant's acquisition of property previously belonging to three family trusts, this case simply comes too late. Plaintiff's claim of a fraudulent mortgage note, which led to the foreclosure sale where Defendant bought the disputed property, may have merit. Indeed, there has been litigation over this mortgage since 2014. Nonetheless, the undisputed evidence demonstrates that the applicable statutes of limitations for Plaintiff's claims have expired.

The Debtor's level of sophistication and litigiousness leaves a long internet footprint.

8. Although the Debtor's core business and financial activities focus heavily on non-denominational African American Christian themes, the Debtor is not African American and is not religious.

### B. Allegations Relating to Michigan District Action

9. From 2011 through 2019, Bishop Bloomer had a contractual relationship with the Corporate Defendants through which he hosted television programs, which include the programs entitled "Rejoice in the Word" and "The First Word." Bishop Bloomer's activities as an evangelist produced profits for the Debtor through the Corporate Defendants.

10. In September of 2019, the Debtor intentionally participated in a highly derogatory and racist public disparagement of Bishop Bloomer. When confronted by

---

5 See Joan Tringale v. Kevin R. Adell, Case No. 2:23-cv-12309, [Doc. 54]

Bishop Bloomer's objections to racial discrimination/harassment, the Debtor refused to do so, and "doubled down" on racist epithets and abuse that was relentless, deliberate, actionable, and caused damage to Bishop Bloomer. When the Debtor's predatory racism resulted in a constructive discharge that terminated the business relationship between Bishop Bloomer and the Corporate Defendants, Bishop Bloomer's evangelical activities were substantially impacted.

11. On October 12, 2022, Bishop Bloomer initiated the Michigan District Action, styled George Bloomer, et. al v. Kevin Adell, et. al, Case No. 2:22-cv-12433-SKD-DRG, currently pending and will presumably be stayed in the U.S. District Court Eastern District of Michigan (Detroit) (the "Michigan District Court") to recover for, inter alia, the conduct described briefly in the preceding paragraph against the Debtor and the Corporate Defendants (collectively, the "Michigan Defendants").

12. On November 28, 2022, Bishop Bloomer filed the "Verified Amended Complaint and Demand for Jury Trial" (the "Operative Complaint") [E.D. Mich. Doc. 17] in the Michigan District Action, seeking relief under 42 U.S.C. §1981 et. seq., 28 U.S.C. §1988, for violation of Bishop Bloomer's civil rights in connection with racial discrimination, racial harassment, and racially motivated retaliation, for breach of contract, unjust enrichment, and quantum meruit.

13. After travelling under the Operative Complaint, the Michigan District Court entered its "Joint Final Pretrial Order" (the "Pretrial Order") [E.D. Mich. Doc. 116], and setting trial.

14. Commencing on October 6, 2026, and culminating on October 14, 2026, the

Michigan District Court conducted a jury trial on the merits. The result was a verdict (the "Verdict") [E.D. Mich. Doc. 128], finding that the Corporate Defendants were an integrated enterprise operated as a single integrated employer, finding racial discrimination, hostile work environment, and retaliation under 42 U.S.C. §1981, providing compensatory damages of $9,200,000, punitive damages of $51,000,000, and $2,000,000 unjust enrichment, for a total of $62,200,000 against the Michigan Defendants as more fully reflected in the attached Exhibit "A." Other related claims for fees and costs have yet to be liquidated.

15. Following dismissal of the jury, the Michigan District Court provided a briefing schedule to counsel of record, so that the Verdict can be rapidly reduced to a final judgment.

16. It is possible that the Debtor may seek post-judgment relief, or appellate review; however, in the aftermath of the Verdict, the Debtor has instead sought a different form of relief, more than 1,200 miles away from the courthouse presiding over the Michigan District Action.

17. It is noteworthy that while the Michigan District Court and counsel of record are all motivated to conclude the Michigan District Action with events transpiring during the jury trial very current in their minds, there is no actual collection activity because the ministerial act of entering a final judgment has not occurred, and for that reason time periods for post-trial motions have not yet commenced.

### C. <u>Allegations Relating to this Reorganization</u>

18. On October 23, 2026 (the "Petition Date"), the Debtor initiated this

Reorganization by filing a voluntary petition under Bankruptcy Code §301 [Bankr. M.D. Fla. Doc. 1].

19. Also on the Petition Date, this Court entered its "Order Authorizing the Debtor-In-Possession to Operate Business" [Bankr. M.D. Fla. Doc. 4], such that the Debtor is obligated to operate its business and property of the estate pursuant to Bankruptcy Code §§1107, 1108, and the orders of this Court.

20. The filing of the petition has the effect of staying the Michigan District Action as to the Debtor.

21. By filing individually, the Debtor complicates the status of the Michigan District Action as it relates to the Corporate Defendants, neither of which have sought bankruptcy relief in Michigan, Delaware, or Florida. Clearly the stay does not apply to either of them, but the filing is likely to complicate the process of reducing the Verdict to final judgment, which appears to have been the motivation.

22. The Debtor's initial filings remove any doubt but that Bishop Bloomer is the largest creditor in this Reorganization, and other than the IRS the scheduled claims are comparatively small given the apparent direct and indirect holdings of the Debtor.

**D. <u>Allegations Relating to Relief Requested</u>**

23. Bankruptcy Code §362(a) undoubtedly stays the Michigan District Action as against the Debtor, and Bankruptcy Code §362(d)(1) authorizes this Court to enter an order terminating, annulling, modifying, or conditioning the stay "for cause…"

24. In this instance, cause exists because the Michigan District Court has expended four (4) years of judicial effort bringing the Michigan District Action to trial, and

it would appear that the timing and other aspects of commencing this Reorganization threaten to disrupt the final judicial efforts required to fully adjudicate Bishop Bloomer's claims against not only the Debtor but the non-debtor Corporate Defendants. Whether the Debtor has other reasons to have initiated this Reorganization a week after the Verdict, almost as far away from the Courthouse in Michigan as one could get in the contiguous United States, the obvious prejudice and perception of abuse is palpable.

25. The parties to the Michigan District Action, Bishop Bloomer and the Debtor, as well as the Debtor's companies, the Corporate Defendants, have been embroiled in the same controversy since September of 2019, with the Michigan District Action commencing on August 12, 2022, and finally producing the Verdict on October 14, 2026.

26. It can readily be inferred from context that the Debtor anticipated that the Michigan District Action would not go his way, and that he would in fact be found liable for all of the actionable misconduct reflected in the Verdict. However, if the Debtor sincerely wishes to reorganize in chapter 11, the obligation to Bishop Bloomer must be reduced to a final and non-appealable judgment.

27. When a trial goes badly for a litigant, and a huge adverse ruling is handed down, it sometimes happens that the losing party will rapidly initiate bankruptcy proceedings with the goal or byproduct of the filing being the disruption of all deliberation required to conclude the case that has just produced a verdict.[6]

---

6 For example, in the twin cases of Case No. 8:06-bk-05341-PMG, and 8:06-bk-05342-PMG, formerly pending before the Honorable Paul M. Glenn, two (2) professional medical groups sought bankruptcy protection in the Middle District of Florida, Tampa Division, after a tort case pending in the Thirteenth Judicial Circuit for Hillsborough County, Florida, styled Marilyn Navarro, individually and as the limited guardian for Allan Navarro, an incapacitated person and as the natural parent and guardian of Scottie

28. Although it is not typical for a debtor to resort to bankruptcy protection after the verdict but before the judgment is entered against it, there is instructive precedent for granting a creditor victorious at trial stay relief when the trial court is required to finish its work. In re Dampier, 523 B.R. 253 (Bankr. D. Colo. 2015), aff'd, 2015 WL 6756446 (B.A.P. 10th Cir. 2015), and several other cases show instances in which stay relief is found to be appropriate when a debtor is seeking bankruptcy protection in circumstances that would seem to be calculated to derail an existing action close to or at the point of conclusion. In re AP Orangevale, LLC, 2023 WL 5093819, at *11 (Bankr. D. Del. 2023) ("At bottom, it is a confluence of factors that guide the Court's decision. Specifically, the fact that (1) this petition was filed on the eve of trial, (2) the California Superior Court is familiar with these proceedings and has already decided issues relating to the case, (3) the debtor has failed to set forth a compelling reason to keep the stay in place, and (4) the only harm the debtor will suffer raises concerns over forum shopping. Taken together, there is sufficient cause to lift the stay.").

29. The existing case law also accounts for the timing of a petition in relation to

---

Navarro, a minor v. Michael P. Austin, D.O., et. al., produced a $116,700,000 jury verdict. On the evening before the jury was to return to hear evidence and argument on the punitive damages phase of the trial, both entities filed petitions and sought to disempanel the jury based upon Bankruptcy Code §362(a). Instead, on emergency motions of the plaintiff tort victim at 3:00 a.m. immediately following the nighttime bankruptcy petitions, the Court granted relief in both cases, such that the jury trial could continue before the Trial Court. Although the jury had been sequestered, and knew nothing of the bankruptcy filings and related deliberations before the Bankruptcy Court, the jury was reconvened the afternoon following the bankruptcy filings, returning a punitive damage verdict for $100,100,000, and bringing the total award to $216,800,000, such that the resulting bankruptcy cases could proceed with the debt liquidated. This was one of the largest medical malpractice verdicts in Florida history for decades, because the Bankruptcy Court enabled the trial process to continue and conclude properly. And in due course, because the purpose of derailing the jury process had failed, they were dismissed. Although decided in some measure based upon abstention theory, the result was the same as that sought in the current context. An article showing this strikingly similar fact pattern is attached hereto as Exhibit "B."

the progress of the litigation stayed as a result of the filing. See e.g. In re Caporal, 2023 WL 4687815, at *5 (Bankr. D. N.M. 2023); In re Crespin, 581 B.R. 904 (Bankr. D. N.M. 2018); In re Curtis, 40 B.R. 795 (Bankr. D. Utah 1984).

30. The foregoing constitutes a basis for granting Bishop Bloomer relief from the automatic stay to adjudicate all claims and defenses at issue in the Michigan District Action, through entry of final judgment, and any and all other proceedings short of enforcement/collection of the debt, that should occur in the context of this Reorganization.

**E. Request for Judicial Notice/Right to Supplement/Reservation of Rights**

31. In support of all the relief requested above, Bishop Bloomer requests judicial notice of the record in the Michigan District Action, pursuant to Federal Rule of Evidence 201 and other applicable law. Bishop Bloomer is prepared to supplement this filing with any declarations needed to establish cause, but urges that the procedural history through the point of the Verdict establishes a basis for relief requested above.

32. The undersigned, having been retained only hours after the Debtor commenced this Reorganization, is still reviewing relevant information and documentation, and reserves the right to supplement and otherwise update this motion as required in the interest of justice.

33. Bishop Bloomer is filing this motion on an expedited basis, in light of the fact that post-trial briefing and related efforts on behalf of the Michigan District Court and counsel are required to advance to final judgment, with initial post-trial deadlines set to expire this Wednesday, October 28, 2026, and any other post-trial activities. The undersigned is aware that similar relief on similar theories may additionally or alternatively

be requested, but Bishop Bloomer is reserving rights to seek comparable relief in other motions rather than herein, so as to comply with L.B.R. 7001-1(k)(1) and other applicable law.

WHEREFORE, Bishop Bloomer respectfully requests the order of this Court that will:

a. grant this motion;

b. terminate the automatic stay with respect to the Michigan District Action, to enable the Michigan District Court to enter final judgment, entertain all post-judgment motions practice, and through adjudication of any appeal or other proceedings, exclusive of enforcement; and

c. provide for such other relief as this Court determines to be necessary and appropriate in the circumstances.

Dated this 25th day of October, 2026.

/s/ John A. Anthony
**JOHN A. ANTHONY, ESQUIRE**
Florida Bar Number: 0731013
janthony@anthonyandpartners.com
**ANTHONY & PARTNERS, PLLC**
100 S. Ashley Drive, Suite 1600
Tampa, Florida 33602
Telephone: 813/273-5616
Facsimile: 813/221-4113
Counsel for Bishop George Bloomer

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2026, I electronically filed the foregoing with the Court's CM/ECF system which will send a notice of electronic filing to all CM/ECF participants. I further certify that a true and correct copy of the foregoing has been furnished by U.S. first class mail on October 26, 2026, to all parties on the attached mailing matrix.

/s/ John A. Anthony_____
**ATTORNEY**